UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JASMIN RICHARDSON, et al.,

    Plaintiffs,

        v.                        Case No. 16-cv-1786 (APM)

DISTRICT OF COLUMBIA,

    Defendant.

**MEMORANDUM OPINION**

    Plaintiff Jasmin Richardson filed suit under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., to seek review of a Hearing Officer's determination that Defendant District of Columbia correctly concluded that her minor son, C.S., did not have a qualifying disability in 2015, despite subsequent testing that confirmed C.S. exhibits symptoms consistent with at least one disability recognized under the statute.

    Before the court are the parties' cross-motions for summary judgment. For the reasons that follow, the court grants Defendant's motion.

I

    C.S., Plaintiff's four-year-old son, began receiving special education services under Part C of the Individuals with Disabilities Education Act ("IDEA"), in 2014 at Early Learning Center, a nonprofit service provider in Washington, D.C. *See* Admin. Rec., ECF No. 9, Pts. 1–10, ECF Nos. 9-1 through 9-10 [hereinafter A.R.], at 6–7.[1] Part C of the IDEA provides for early intervention services for at-risk infants and toddlers until the age of three. *See* 20 U.S.C. §§ 1431–1433. The

---

[1] The Administrative Record appears on the docket in ten parts. Because the pagination is continuous throughout, the court cites to the Record as though presented as a single document.

D.C. Office of the State Superintendent of Education determined C.S. was eligible for Part C educational services based upon a Strong Start D.C. Early Intervention Program evaluation conducted in October 2014, as part of which the evaluators administered the Battelle Developmental Inventory, Second Edition ("BDI-2"), and the Assessment, Evaluation and Programming System for Infants and Children, Second Edition; reviewed C.S.'s medical records; and observed C.S. A.R. at 6–7.

Because C.S. would turn three years old in late 2015 and no longer be eligible for Part C services, he underwent an initial special education evaluation, consisting of multiple parts, in order to determine whether he qualified for services under Part B of the IDEA. *Id.* at 7, 10; *see* 20 U.S.C. § 1412(a)(9). Part B of the IDEA provides special education and related services to children and young adults between the ages of 3 and 21. *See* 20 U.S.C. § 1412(a)(1)(A). In April 2015, C.S. was referred to a school psychologist at Early Stages Center, a D.C. Public Schools assessment center, and he underwent a psychological evaluation in mid-July 2015. A.R. at 7–8. As part of that evaluation, the psychologist reviewed C.S.'s October 2014 Strong Start evaluation; interviewed Plaintiff and Plaintiff's mother (C.S.'s grandmother); tested C.S. using the Autism Diagnostic Observation Schedule, Second Edition, assessment and the Pervasive Development Disorder Behavior Inventory assessment; and, on July 28, 2015, issued a report with his findings. *Id.* at 7–8, 55–63. Additionally, an occupational therapist observed C.S. in class in early July and interviewed his teacher. *Id.* at 9, 68–69. Lastly, a speech-language pathologist evaluated C.S. in July, as well. She observed C.S. in class; interviewed C.S.'s speech-language provider and classroom teacher; reviewed the Early Stages' interview of Plaintiff and Plaintiff's mother; administered an Otoacoustic Emissions test and Preschool Language Scales, Fifth Edition, assessment; and committed her findings to a report issued on July 22, 2015. *Id.* at 8, 45–54.

In late July 2015, a Multi-Disciplinary Team ("Defendant's team") held a meeting, which Plaintiff and Plaintiff's mother attended, and concluded C.S. was not eligible for Part B services because he did not qualify as a child with an Autism Spectrum Disorder, Speech or Language Impairment, or Developmental Delay. *Id.* at 8–9. In making that determination, the team reviewed C.S.'s BDI-2 scores from 2014, the July 2015 psychological evaluation by the Early Stages school psychologist, the July 2015 speech-language assessment, and the July 2015 classroom observations by the occupational therapist. *Id.* at 75–89. As a result of Defendant's team's determination, C.S. stopped receiving speech-language and occupational therapy services in fall 2015 because he had aged-out of eligibility for Part C services. *Id.* at 7, 10.

Plaintiff disagreed with Defendant's team's determination and requested that Defendant fund an Independent Educational Evaluation of C.S. Pursuant to Plaintiff's request, Defendant provided funding for psychological and speech evaluations of C.S. in the early part of 2016 to determine whether he qualified as a child with a disability. *Id.* at 10. First, on February 10, 2016, an independent audiologist performed a speech-language evaluation of C.S. and concluded he "had an expressive language deficit in verbal language communication for which he needed speech-language therapy." *Id.* at 11. Next, in mid-February 2016, an independent psychologist observed C.S. in the classroom and administered a variety of cognitive, educational, and behavioral assessments. *Id.* at 10–11. The independent psychologist determined that C.S. presented with clinical symptoms consistent with Global Development Delay, as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, and Autism Spectrum Disorder, as defined under District of Columbia law. *Id.* at 11. Lastly, in April 2016, an occupational therapist reviewed C.S.'s records; interviewed his classroom teachers, Plaintiff, and Plaintiff's mother; made clinical observations; and tested C.S. using the Peabody Developmental Motor Scales, Second Edition,

3

assessment. *Id.* The occupational therapist concluded C.S. "needed support for fine motor delays." *Id.* at 12.

In late April 2016, Defendant's team reconvened and determined C.S. met the eligibility criteria for Developmental Delay and, therefore, was a child with a disability entitled to a free appropriate public education ("FAPE"). *Id.* Plaintiff subsequently sought a due process hearing to review the team's earlier conclusion that C.S. did not qualify as a child with a disability in July 2015. *Id.* at 3.

After holding a hearing on the matter, the Hearing Officer ruled in favor of Defendant. First, the Hearing Officer concluded that Defendant's team's July 2015 evaluation was "comprehensive," as required by the IDEA, because it included review of the psychological, speech-language, and occupational therapy assessments that the Early Stages assessment center conducted in July 2015, as well as the BDI-2 assessment completed as part of the Strong Start evaluation from October 2014. *Id.* at 15. Although Plaintiff's expert, Dr. Keisha Mack, had testified that there were "missing pieces" in the July 2015 psychological evaluation, making it unreliable, the Hearing Officer discounted Dr. Mack's opinion because Dr. Mack also stated she had not reviewed the Strong Start assessment data, on which the July 2015 psychological evaluation relied, and, therefore, could not affirmatively rebut the findings of the July 2015 psychological evaluation. *Id.* at 15, 423–25. The Hearing Officer also rejected Plaintiff's argument that the July 2015 psychological evaluation was deficient because the Early Stages school psychologist did not conduct any classroom observations of C.S. or interview C.S.'s teachers himself, but instead, relied on the classroom observations and interviews of the speech-language pathologist. *Id.* at 15–16. Second, the Hearing Officer determined that Defendant's team appropriately concluded C.S. was not a child with a disability in July 2015 because the data presented did not meet the District of Columbia's definition of either

4

"Developmental Delay" or "Autism Spectrum Disorder." *Id.* at 17–21 (citing 5-E D.C.M.R. § 3001). Specifically, with respect to the possibility of Autism Spectrum Disorder, the Hearing Officer explained that Plaintiff had not proven C.S. qualified as a child with an Autism Spectrum Disorder because her expert did not make that conclusion on the record as part of her opinion. *Id.* at 20. Separately, with respect to the Developmental Delay, the Hearing Officer found Plaintiff had not met her burden of proof because Dr. Mack "could not dispute the conclusions and recommendations of the DCPS Early Stages evaluators [in 2015]" because she had not reviewed the data underlying that assessment. *Id.* at 21. Consequently, the Hearing Officer determined C.S. was not a child with a disability in July 2015 and, therefore, was not denied a FAPE. *Id.*

Plaintiff filed the present action on September 7, 2016, seeking review of the Hearing Officer's determination. *See* Compl., ECF No. 1. The parties submitted cross-motions for summary judgment, which are now ripe for the court's review. *See* Pl.'s Mot. for Summ. J., ECF No. 10 [hereinafter Pl.'s Mot.]; Def.'s Cross-Mot. for Summ. J., ECF No. 12.

II

A parent dissatisfied with the outcome of a due process hearing concerning an IDEA claim may appeal that decision to a federal district court. 20 U.S.C. § 1415(i)(2)(A). The reviewing court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and, (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C). The party challenging the hearing officer's ruling bears the burden of "persuading the court that the hearing officer was wrong." *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988). Although the court owes some deference to the hearing officer's decision, "a hearing decision without reasoned and specific findings deserves little deference." *Reid ex rel. Reid v. District of Columbia*,

5

401 F.3d 516, 521 (D.C. Cir. 2005) (internal quotation marks omitted). When neither party presents additional evidence to the district court, "a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record." *S.S. ex rel. Shank v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 64 (D.D.C. 2008) (internal quotation marks omitted).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015). On cross-motions for summary judgment, each party carries its own burden to demonstrate that there are no disputed material facts and it is entitled to judgment in its favor. *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2011).

III

The IDEA guarantees the right of "[a] free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A). In order to meet this statutory obligation, school officials must identify those students with a disability, "develop a comprehensive strategy, known as an 'individualized education program,' or IEP, tailored to the student's unique needs," and have the IEP in place at the start of each school year. *Leggett v. District of Columbia*, 793 F.3d 59, 63 (D.C. Cir. 2015) (quoting 20 U.S.C. § 1414(d)).

The United States Code sets forth three broad criteria that the local educational agency must meet when evaluating a child's eligibility for services under the IDEA and determining the scope of the services that child needs. First, it must "use a variety of assessment tools and strategies" to

determine "whether the child is a child with a disability[] and the content of the child's individualized education program." 20 U.S.C. § 1414(b)(2)(A). Second, the agency "[can]not use any single measure or assessment as the sole criterion" for determining either whether the child is a child with a disability or the educational needs of the child. *Id.* § 1414(b)(2)(B). And third, the agency must "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." *Id.* § 1414(b)(2)(C).

Attendant federal regulations impose additional criteria that school officials must use when evaluating a child to determine if he or she has a disability. A child's initial evaluation or reevaluation must consist of two steps. First, the child's evaluators must "review existing evaluation data on the child," including any evaluations and information provided by the child's parents, current assessments and class-room based observations, and observations by teachers and other service providers. 34 C.F.R. § 300.305(a)(1). Second, based on their review of that existing data and input from the child's parents, the evaluators must "identify what additional data, if any, are needed" to assess whether the child has a qualifying disability and, if so, "administer such assessments and other evaluation measures as may be needed." *Id.* § 300.305(a)(2), (c). Under the first step of the analysis, the state agency is required to "[u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent." *See id.* § 300.304(b). All the methods and materials used must be "valid and reliable" and "administered by trained and knowledgeable personnel." *Id.* § 300.304(c)(1). With respect to the second step of the analysis, if the state agency determines that existing data supports a finding that the child is not a child with a disability and no additional information is necessary before making that ineligibility determination, then the state agency must

7

notify the child's parents of their right to request a subsequent assessment of their child. *Id.* § 300.305(d)(1). In combination, these regulations have the effect of ensuring "an evaluation both confirms the student's potential disabilities and examines whether she needs services." *Davis v. District of Columbia*, No. 15-1194, 2017 WL 1102647, at \*17 (D.D.C. Mar. 23, 2017).

Plaintiff claims that the July 2015 psychological evaluation of C.S. was not "comprehensive," and for that reason, Defendant's team's reliance on that evaluation rendered the team's decision procedurally deficient and denied C.S. a FAPE. She believes the July 2015 psychological evaluation is lacking in two respects. First, the evaluation does not include first-hand classroom observations or teacher interviews; the psychologist only cross-referenced the speech pathologist's observations and interviews. *See* Pl.'s Mot. at 16–17. Second, the psychologist relied on an outdated assessment—the BDI-2, administered in October 2014—that did not reflect C.S.'s contemporary developmental state, thereby skewing the results of the evaluation. *See id.* at 19. These defects in the psychological evaluation, according to Plaintiff, both denied Plaintiff the opportunity to meaningfully participate in Defendant's team's decisionmaking process and caused Defendant's team to come to the wrong conclusion. *Id.* at 25–26.

Plaintiff's belief that federal law required the 2015 psychological evaluation to contain first-hand interviews with the student's parent(s) and classroom evaluations of the student is mistaken. The federal law and regulations to which Plaintiff points simply do not impose any specific requirements on the content of a psychological evaluation. *See Hill v. District of Columbia*, No. 14-1893, 2016 WL 4506972, at \*18 (D.D.C. Aug. 26, 2016); *cf. Damarcus S. v. District of Columbia*, 190 F. Supp. 3d 35, 50 (D.D.C. 2016). The statute itself requires those making an eligibility determination to "[u]se a variety of assessments"—of which a psychological evaluation is just one— and "technically sound instruments," so that the team can assess cognitive, behavioral,

physical, and developmental factors as part of their determination. 20 U.S.C. § 1414(b)(2)(C). Additionally, assessments and other evaluation materials must be nondiscriminatory, communicated in a way the child will understand, "valid and reliable," "administered by trained and knowledgeable personnel," and conducted in accordance with the attendant instructions. *Id.* § 1414(b)(3)(A); 34 C.F.R. § 300.304(c)(1). Lastly, the student must be "assessed in all areas related to the suspected disability." 34 C.F.R. 300.304(c)(4).

The court finds no procedural defect in Defendant's team's 2015 determination based on the lack of first-hand classroom observations and teacher interviews by the school psychologist. The 2015 psychological evaluation, conducted by a professional psychologist, was "technically sound" insofar as it allowed Defendant's team to consider C.S.'s family, medical, developmental, and educational histories, as well as social, emotional, and behavioral functioning. *See* 20 U.S.C. § 1414(b)(2)(C). Moreover, that evaluation was supplemented by the other types of information Defendant's team needed to consult before making an eligibility determination. The team reviewed not only the July 2015 psychological evaluation, but also the 2014 BDI-2 assessment, the July 2015 speech-pathology evaluation, and the July 2015 occupational therapist's notes. A.R. at 75–89. By considering those materials, the team "reviewed existing evaluation data" that included input from Plaintiff—C.S.'s parent—in both 2014 and 2015; "current" classroom-based observations, as reflected in the occupational therapist's notes and speech-pathologist's report; an updated autism test conducted by the psychologist; and observations by C.S.'s teacher, as reflected in both the occupational therapist's and speech pathologist's reports. *See* 34 C.F.R. § 300.305(a)(1). Although the psychologist's evaluation itself did not contain classroom-based observations or a teacher interview, classroom-based observations *and* teacher interviews were made available to Defendant's team through the speech-pathology evaluation and occupational therapist's notes. The

9

federal regulations do not require that a particular professional conduct classroom observations and teacher interviews, only that those observations and interviews be completed and Defendant's team to review them. Consequently, Defendant's team consulted all the types of information it needed to prior to making its eligibility determination.

It is less clear to the court, however, whether Defendant's team needed to order updated testing so it could properly assess C.S.'s contemporary levels of academic achievement and related developmental needs, as required under 34 C.F.R. § 300.305(a)(2)(ii). The regulations do not speak directly to when a local educational agency must order updated testing, but Plaintiff's expert opined that the BDI-2 test was "old" and "developmentally a lot happens in a year," A.R. at 412–13, which suggests to the court that it may have been necessary for Defendant's team to order new assessments of C.S. before determining his eligibility for Part B services. The Hearing Officer discounted Dr. Mack's testimony as a whole because she had not reviewed the 2014 Strong Start assessment data, on which the 2015 psychological evaluation relied. *See id.* at 15, 21, 424–25. The fact that Dr. Mack stated she could not rebut the findings of the 2015 psychological evaluation is separate, however, from her opinion that Defendant's team's determination relies, in part, on outdated information. The Hearing Officer's Decision does not address that latter point.

The court need not resolve this issue today, however, because even assuming Defendant's team procedurally erred by failing to order new testing, Plaintiff has not met her burden of demonstrating that C.S. was denied a FAPE in 2015 as a result. Not all procedural violations constitute denials of a FAPE; only those that affect the student's substantive rights. *McLean v. District of Columbia*, No. 16-2067, 2017 WL 3891669, at *3 (D.D.C. Sept. 5, 2017). A hearing officer may find a procedural violation caused the denial of a FAPE in any of three circumstances: the procedural inadequacy "(i) [i]mpeded the child's right to a FAPE; (ii) [s]ignificantly impeded

the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) [c]aused a deprivation of educational benefit." 34 C.F.R. § 300.513(a)(2). Plaintiff points to no record evidence supporting a finding that any of those three circumstances occurred in this case. Here, Dr. Mack testified at length about the deficiencies in the psychologist's evaluation but never offered an opinion that updated testing in 2015 likely would have indicated C.S. had a disability and likely would have led Defendant's team to determine C.S. was eligible for Part B services. *See* A.R. at 406–13; *cf.* 34 C.F.R. § 300.513(a)(2)(i), (iii). Correlatively, absent any suggestion that updated testing would have indicated C.S. had a disability in 2015, the court cannot conclude that the failure to order updated tests significantly impeded Plaintiff's right to participate in the decisionmaking process. *Cf.* 34 C.F.R. § 300.513(a)(2)(ii). Thus, even assuming a procedural violation occurred, the court concludes C.S. was not denied a FAPE in 2015.

IV

In light of the foregoing discussion, the court denies Plaintiff's Motion for Summary Judgment and grants Defendant's Cross-Motion for Summary Judgment. A separate Order accompanies this Memorandum Opinion.

Dated: September 19, 2017

Amit P. Mehta
United States District Judge

11